Good morning, Your Honors. Good morning. May it please the Court, my name is Sharon Lappin, and I represent the appellant Special Devices, INC. and Joseph Sbronza. I'd like to start off this morning with just a brief background about Special Devices, INC. This is a small corporation, a startup technological company, which designs, manufactures, and hopes to sell medical devices. It was formulated in 1990, and Mr. Bogley, the plaintiff and appellee, first became involved with Special Devices, INC. in the summer of 1995. He first became familiar with the corporation through another stockholder who was a personal friend of his, and he actually approached Special Devices. Special Devices did not solicit his interest in the company. It's a company that holds patents, writes patents, and has intellectual property. Mr. Bogley had received a copy of the 1994 prospectus from his friend who was a shareholder and had reviewed that information prior to contacting Mr. Sbronza of Special Devices for that first meeting. In that first meeting, which was held in the summer, as I said, of 1995, the corporation did not even have its structure up at that point. It was under construction. They were operating out of a large tent, if you will, and it was a very young company that was devoted to technology and not so worried about its facilities at that point  Mr. Bosley? I think we know, I think we were aware of the facts or, you know, how that proceeds in the record. My question to you would be, was there a specific correspondence or event prior to June 1998 that you contend should have placed Bosley on notice of the alleged fraud? What was the event or what was the correspondence? Yes. In fact, and that goes to the issue of the statute of limitations, which was alleged. There were several events or occurrences, if you will, as early as October of 1995, so a couple of months after Mr. Bosley made a statement. But I said, was there a specific one? You're saying there were several. Is there one in specific that you'd just say? No, there's not one in particular. There's several that I believe gave Mr. Bosley ample opportunity if he felt that there was fraud going on here to initiate this action, and he failed to do so. The last event, if you will, there was correspondence minutes from a meeting. The advisory task contract that Mr. Bosley himself wrote, but the last one was a letter in September of 1997. And so the one-year statute would have, I believe, should have ran from that point in time, and yet the action was not filed until March of 1999. Well, the court essentially had to make, you took one position, and obviously Mr. Bosley took another position on that, and I think part of your argument was that this was not a neophyte, I mean, it was an experienced guy, and so that was part of your argument. But I guess when I consider both of those arguments, I mean, the court essentially had to make a judgment call and sort of make a factual determination at that point, right? Correct. And ruled against you. So on that, even though the statute of limitations can be, it's a legal issue, but sometimes it has a subset of a factual determination as to when a person was on notice. On that particular point about when he was on notice, isn't the standard of review sort of difficult for you there? Because that was a factual determination, essentially. That was a factual determination, but I think there was sufficient evidence presented at the trial to indicate that over a period of time, Mr. Bosley had the opportunity to make that decision that he had noticed, if you will, that there was fraud. He was very active, not only as a shareholder, but also in the operations, if you will, of special devices by his own choosing. He requested to become more active, and that led up to his second stock purchase in the spring of 1996. So I guess what I'm saying, though, is it sort of looks like there were arguments both ways, and if the court had gone the other way, I think they would be in a difficult position to go against what the court found the fact, you know, when he was on notice, just like you're in a difficult situation, as the court, you know, there were a number of things the court had to weigh, and there wasn't, there's not one statement that says, you know, I knew at that point that everyone agrees on. So you're saying these events, he should have been, and they're saying, no, it wasn't until then, and the court obviously bought their argument. That's true. And there's evidence, really, that supports either way, is what I'm saying, and that's one of those difficult situations that whoever loses has a tough hill to climb on that. I concede you're right. There was not one particular event that stuck out and made itself clear factually, as far as that's concerned. So moving on from that theory, we then have the matter proceeded then on the issue of whether there was fraud and misrepresentation on the part of special devices and Joseph Branza. And, you know, you've read the brief and you've read the record, so you could see what my argument was as far as that was concerned. As the court itself, I believe, understands, Mr. Bosley was a knowledgeable investor. He professed to be a knowledgeable investor, and he also professed to be an experienced businessman and that he could offer his talents, if you will, to special devices so that he could start to market its product and recognize revenue. But, again, the facts, I think, were pretty clear from the evidence at trial that this was a young company that did not have the revenue stream yet that it hoped to. And the information that was provided to Mr. Bosley when he first became interested in special devices, at trial there was this significant issue about whether it was prospectus that he relied upon or whether it was a business plan. And of course, it was my client's contention that it was the prospectus from 1994 that had been provided to Mr. Bosley prior to his initial contact, as opposed to a business plan. Mr. Bosley's testimony was that he relied on a business plan that was provided to him at that initial meeting. I have a question in terms of just assuming for a moment that the court decided against you on all issues. For the purposes of responding to the motion for sanctions, what do you think is your strongest argument on appeal, and why? There was no deliberate action on the part of my clients to defraud Mr. Bosley. You know, it has to be a deliberate intent. They never had that intent to cause any harm to Mr. Bosley. He still retains his stock. He has not lost any interest, so there hasn't been a loss to him as far as that's concerned. The trial court awarded him pre-judgment interest. So the stock isn't as valuable today as it was allegedly at the time when he purchased it, is it? It has increased in value. It has increased? It has increased. Yes, it has. And the trial... How much did he pay per share for the stock when he bought it? There was two groups. It was $250 at one time, and I think $300... Per share? Yes. How much is the stock worth today? Well, the stock is split since then. Well, what's it worth today? What's a single share worth today? Well, don't you know? Eight dollars. I believe it's eight dollars. That was my last information. I don't know if it's increased. Judge Callahan's question, though, was directed at the appeal. What's your best argument on appeal? In other words, what's the best argument that would justify reversing the district court's judgment? I believe that the principal amount of the judgment itself is more than sufficient, and the actions of my client were not. I believe the evidence of trial did not show that there was a deliberate fraud on the part of my client. So that the evidence did not support the district court judge's... Correct. ...findings of fact. Correct. His findings of fact were clearly erroneous. That's correct. Okay. Okay. Thank you, counsel. Why don't you save some time for rebuttal? I know that, you know, we spent a lot of time with your briefs and the records, so we're... Thank you. ...familiar with the case. Good morning. Excuse me. Good morning. Megan Wagner on behalf of Plaintiff and appellee, Mr. Fred Bosley. I will address the points that were raised in the appellant's opening arguments and obviously accept any questions as they come up.  Mr. Bosley was aware of the fraud that had been perpetrated on him prior to March of 1998. The evidence is not only not clear and convincing in favor of the appellant, it is clear and convincing in favor of Mr. Bosley. What appellant has glossed over through her brief as well as through her opening argument are the various and numerous misrepresentations that were made to Mr. Bosley. First and foremost, as was focused on by the trial judge, were the misrepresentations regarding whether or not this company had patents. As the Court will recall from the briefings, on just about every occasion, in the 94 prospectus, in the 95 prospectus, in the meeting of July of 96, excuse me, of July of 95, when Mr. Bosley first met with Mr. Sponza, representations were made that SDI, which refers to itself as a technology company, had patents. In fact, the phrase, a plethora of patents, appears in, I believe, the 94 prospectus. Along those same lines, the prospectus is referred to how SDI is protected by a patent protection system, that SDI has a good market position because it has monopoly because of these patents. In June 1995, one month before this meeting between Mr. Sponza and Mr. Bosley, in which Mr. Sponza convinced Mr. Bosley to spend $75,000 to buy stock in SDI, Mr. Sponza was informed by the U.S. Patent Office that the only patent that had ever been issued and held by SDI had expired. A month prior to this meeting, Mr. Sponza knows that he has not a single patent on any of the technology of this theoretically up-and-coming technology company. Nonetheless, he informs Mr. Bosley that he has a patent protection system, that they are set to take 30 percent market share because of this. He makes these representations and never once corrects them. Mr. Bosley didn't find out the truth of the matter until trial, or until the depositions in this case, actually. That's one set of the representations. Another set of representations has to do with the value of the stock. Now, the Appellants Council has said there are various different actions that show that Bosley knew what was going on. In fact, the record is clear. Bosley only knew what he was told. And what he was told were that the sales of this company were in the range of $130,000 in 1995 and were expected to be $5 million in 2000. He was given two to three pages of a 1995 financial. That's it. That's the only financial information Mr. Bosley was privy to. So despite the fact that he was at the site on occasions, that he had meetings on occasions, that he was attempting to help guide this company forward, he didn't have the information necessary to know that he had been completely defrauded, purposefully, intentionally, knowingly defrauded by Sbranza. That is why in March of 1998 he didn't know he had been defrauded, and that is why it is clear and convincing that, or that, you know, it is clear that the statute of limitations defense was a frivolous defense. There is no evidence that shows, prior to March of 1998, that Mr. Bosley knew there were no patents, that Mr. Bosley knew what the actual sales of the company were, that Mr. Bosley knew that the company had never filed state or federal tax returns. Well, is the standard that he actually knew, or is that he should have known? Listen, the court is obviously correct. The standard is that he should have known. But there is no evidence that he was given enough of a vision or enough insight into what the company was actually doing to come to those conclusions. He recognized that it was having some struggles because it was a new company, and he offered his services to help it get through those struggles. Well, see, I guess when I listen to both of you say this, I think that there is an argument on either side. Now, even the fact that, say, let's just say you have the better argument, all right. If you had lost, there still is evidence, there would still be evidence on the other side for the district court to come to another conclusion. The district court could have found that he should have known sooner by virtue of, they did mention certain conduct. So I guess what I'm, you're saying, okay, so if it was basically a factual determination, and there's some evidence that goes one way, there's some evidence that goes the other. I don't agree with you that there's all your side and none on the other side or whatever. Then how can an appeal, I guess, and you're saying it's frivolous because there was no evidence. Your Honor, perhaps I overstated my case somewhat, but frankly, I don't think I overstated it by much. So no, is an appeal frivolous if something depends on a factual determination and there's evidence on both sides, taking into consideration what the standard of review is? Does that make it frivolous or not? Not necessarily, and I can see a case where the evidence on both sides was close to 50-50, but not enough to overcome the standard to overturn on appeal that is clearly erroneous, but 50-50. In that case, would I advise a client to take the appeal? I don't know. It would depend on the totality of the circumstances. Well, you've got a pretty, you know, a frivolous appeal. It's not an easy hill to climb, just like when I told her she had a tough hill to climb on something else. What's your best argument on that? You know, that's, it's, you know, I have to say sometimes if I have to spend a lot of time trying to understand something, then it starts to make me think maybe that's not frivolous. Well, I believe in this case the facts are somewhat confusing simply because of the way that they've been presented, because not the entire record was before the court in the opening brief, and in the athlete's brief we tried to correct and give a bigger picture. And so to a certain extent, you know, it might appear that there was more evidence than there really was in favor of Mr. Spronza on the statute of limitations. But if you actually look at the evidence that they present, it's smoke and mirrors, Your Honor. It's, well, he went to meetings, but they leave out that in the meetings he wasn't given any real information. They say he proposed that he do this advisory work, but they leave out that the court specifically found that he was prevented from doing any of the advisory work because SDI was not being cooperative. They point to, you know, various things, but they leave out significant information. And when the significant information is weighed into this, then we don't have a case where it's nearly 50-50. We have a case where it's overwhelmingly in favor. All right. But what do you have to show for us to award you sanctions under it being a frivolous appeal? That it was frivolous. All right. But what does frivolous mean? Frivolous is, I left that brief over there, but it's without merit. Well, that's not enough. I mean, it has to be extraordinarily clear. This is a, you know, it's a, you've taken the yes, but answer to the, there's this fact that we have counterfacts. I mean, it's a, because on the, if you lose on the merits, that's what happens every day in this room. Somebody loses. That is true, Your Honors. Somebody wins. But we will submit, and frankly, it's, it is our position, it is obvious from our papers, that this is not a closed case, that the statute of limitations, they have a few facts that they take portions of the evidence and throw it at the wall, but in, you know, our evaluation of that evidence, it is not closed. And in a case like this where you have intentional fraud and a defendant who is unwilling to own up to that, he's been sanctioned to the extent that attorney's fees have been awarded against him, but that was not enough. He has not been deterred, nor has counsel been deterred, from bringing either a frivolous defense or a frivolous appeal. What was the basis for the attorney's fees award in the district court? Is there a statute, contract? It was under statute. I believe it's under 10B. So I gather if you were to prevail in this court, you would have a claim for attorney's fees, is that right? I believe so, Your Honor, but I'm not 100 percent certain. If it's the case. Well, why wouldn't you? If you got attorney's fees from the district court, why wouldn't you be entitled to prevail? I probably would, Your Honor. It's statutory, and, you know, frankly, I don't like to give opinions on statutes without having them in front of me. It's quite possible we would. It is a different standard for the attorney's fees that were achieved below. It's actually a lower standard. It's bordering on frivolous. So, perhaps we have an easier shot at it. It's just one more piece of litigation that I'm not sure is necessary. Well, you become a prevailing party if you win an appeal, though, too, right? Yes, Your Honor. Let me direct your attention to the punitive damage claim. Refresh my recollection of the record. Did Mr. Spronza, is that how you pronounce his name? Spronza, the defendant. Did Spronza's net worth come in at trial? To a certain extent, it did. What does that mean? Excuse me? What does that mean? Well, we didn't have a balance sheet. His net worth came in through a few different areas of assets that he owned. One was the stock of SDI. One was his. What did you contend his net worth was? Essentially $3 million, which was based on his 51 percent ownership of the stock of SDI, which he had valued at $8 a share. But you contend was worthless. I'm sorry? But you contend was worthless, right? No. We contended it was worth significantly less than the $250 that Mr. Bosley paid for and $400 he paid for the second set of shares. Okay. So $3 million was based on $8 a share? It was based on $8 a share. And what did you believe the shares to be worth at the time of trial? The evidence was that they were valued at $8 a share. In addition to he had $150,000 or so equity in his house, he claimed to have two patents, one of which the testimony was was worth $100,000. So the largest chunk of his net worth was obviously the shares. Okay. And punitive damages were awarded in the amount of $150,000, which is a very small portion of that $3 million and is also only half of what the overall compensatory damages were. So in that respect, punitive damages were clearly not excessive. No, I mean, I think their claim is that if you take away the shares of stock and do a fair analysis of his net worth, that it's excessive compared to net worth. It's true net worth. That would be true, Your Honor, but that would ignore the primary question is why would you take away shares of stock? You know, Mr. Sponza accuses us. I'm sorry. Your client still owns stock? My – I don't – I'm not certain of that, Your Honor. At the time the briefing was done, yes, I assume he still does. And it was worth more than the price at which he purchased it? No, Your Honor. Well, no, Your Honor, because the price at which he purchased it was $250 for the first set and I believe $400 for the second purchase. Those values were based on completely trumped-up values of the company, because those prices, when he purchased the stock, he was being told that the company was worth millions of dollars, when in fact, based on the analysis of SGI and Sponza of the value being 12 times the sales, it was really only worth $40,000. Those purchases at $250, $400 a share were also being based on the company having value in terms of valuable patents that it had and it didn't have any. So clearly the value of the stock that he purchased is not the $250 to $400 a share. It is significantly less than that. Is it without value? Probably not. $8 a share is $8 a share. There is some value. Excuse me. But there was a loss which justifies rescission, which is obviously a remedy available to Mr. Bosley. Okay. Any further questions? I think we have your argument in hand. Thank you.  Rebuttal. I'll be brief. Mr. Bosley still retains his stock. He's not made any efforts or any attempt to sell it. The judgment calls for rescission. He still holds his stock. It's my client's position that it's worth more now and it was worth more at the time of trial than it was at the time that Mr. Bosley purchased the stock. Mr. Bosley was fully aware of the fact that this was a young company. It had, as I said, no structure at that point. It had that first meeting, he was shown the bone depth. Okay. I guess I'm just kind of seeing. Okay, if the stock is worth more and your client owns, what, 51%? Correct. What's the problem with the punitives? Well, it was interesting at trial because on the issue of during the course of the trial, the plaintiff attempted to prove that SDI is worthless and that Mr. Speranza had no net value, no worth, if you will. And then when it came to that portion of the trial that addressed punitive damages, suddenly they turned the evidence the other way to show that he was worth a tremendous amount. How would the $8 come from? A share. When the stock split. Okay. And did your client dispute the $8 a share? No. No. Okay. So your client doesn't dispute that he owned 51%, doesn't dispute the $8, so that comes up to, what, $3 million, they said. But under the U.S. State Court versus Campbell, it, you know, how is that, what's the problem with that punitives? Well, going backwards, as counsel was just indicating, saying that on the issue of fraud that there were no patents in place, if I can help the court out a little bit here. But can't you take inconsistent positions at trial and during the punitives? Are you saying you can't? No, I'm not saying you can't. I'm saying that's exactly what occurred was inconsistent positions.  So what's wrong with that? Well, it's just to serve a certain purpose, if you will. Okay. But how does that help us in deciding that the punitives are too much? I don't know that it necessarily does. I just wanted to point that out, that the same evidence was used for different theories. There's a sword and a shield. There you go, if you will. But as to the issue of the patents, a patent can take many years to perfect, and a patent, Mr. Sbranza writes the patents. He did not employ the services of a patent attorney. He's learned a lot over the years in terms of how to work with the patent office and how to properly write the patent, if you will. But the patent protection was always in place, because as long as patents are at least applied for, then the protection commences upon the application for a patent. In particular, the bone depth gauge had been issued, but at the time that Mr. Bogley made his initial purchase, stock purchase, there had been a maintenance fee that had been in place on that patent, and that was a relatively new procedure to the patent office, and my client had sent in his maintenance fee check in May of 1995, and it had been returned. Apparently, the way in which it was submitted was procedurally incorrect, and so he then spent several months correcting it, but had no reason to believe that the patent protection would be lost as a result of what Mr. Bogley claimed was the expiration of the patent. It technically didn't expire. It just sort of went into a limbo status until that maintenance fee issue was perfected, and patents can be patent pending. There was also another patent that had been in place, was actually owned by SDI. At trial, there was an issue that the misrepresentation was that SDI did not own any of the patents. What is customary is for the person who writes the patent, who creates the product, holds the patent, if you will. It's individually held, and it can be assigned, and there was one patent in place that had already been assigned to special devices at the time that Mr. Bogley came on board. So the patent protection was always in place and remains in place. This company has now written 17 patents during its tenure. So the representation that there was no patent protection was erroneous. It's a question of understanding the particulars of patent law, if you will, and the procedures surrounding the patents. Otherwise, I submit. Thank you very much, counsel. Case just heard will be submitted. We'll proceed with the next case on the oral argument calendar, which is City and County of San Francisco versus PG&E. Ms. Valdez.
judges: Thomas, Paez, Callahan